STOULIG, Judge.
Plaintiff, Benedetto DiMacco, was one of a two-man motorcycle detail assigned by the New Orleans Police Department to convoy a float from Algiers to the City Hall in New Orleans to be used in a St. Joseph’s Day Parade. Some three blocks after the convoy began and before it had crossed the Greater New Orleans Mississippi Bridge, plaintiff was struck in the back by the float causing the injuries forming the basis of this action. Named as defendants were: (1) Kinder Henry, the driver; (2) Blaine Kern Artists, Inc., the builder; (3) Phoenix of Hartford Insurance Company, Kern’s insurer; (4) The Greater New Orleans Italian Cultural Society, sponsor of the parade; and (5) Continental Casualty Company, the Society’s liability insurer for its St. Joseph’s Day activities, including the parade.
After a lengthy trial, judgment in the amount of $10,779 was rendered against Kinder Henry only, from which judgment plaintiff has lodged this appeal reurging the liability of all named defendants and seeking an increase in quantum of damages.[1]
The facts are not seriously disputed. On March 18, 1967, The Greater New Orleans Italian Cultural Society (hereinafter referred to as the Society) planned its first parade to commemorate St. Joseph’s Day. In this connection, John Fazzio, a member, asked Blaine Kern, a noted New Orleans designer, to donate a float for the parade. Fazzio gave Kern the impression the request for the donation originated with the then New Orleans Police Superintendent Joseph Giarrusso, also a member of the Society, who was one of the prime movers in organizing the parade. In any event, Kern agreed to donate one of the self-contained floats used in a previous Rex parade, and refurbished it to conform to the St. Joseph decor.
According to its designer the unit was propelled by a “mule” or small tractor contained within the float itself. The float measured 16 feet in length, 7 feet in width and 4 feet, 2 inches in height from street level to its base platform covering the tractor, with a second platform 32 inches above it supported by two-by-fours. The driver’s seat was located 6 to 7 feet from the front of the float with a 32-inch high opening between the lower and upper platforms for unobstructed view for existing conditions in all direction. He testified that the driver had a greater degree of visibility than provided by either an automobile or a truck. As additional safety factors, the bottom of the float was never higher than 18 to 20 inches from the ground and a “cowcatcher” effect of bent tubing and plywood was placed in the front to prevent anyone falling from being jammed beneath the float. In several instances during the course of his testimony, Kinder Henry corroborated the driver’s wide range of visibility.
It is undisputed that Mr. Kern told members of the Society that liability insurance should be procured and that they were required to furnish the driver. It developed that the defendant Kinder Henry, an employee of Fazzio’s Bowling Alley, overheard his employer mention the need for obtaining a driver and offered his service. Henry testified that he was interested in driving a float because it would be a unique experience for him to drive a float in a parade. He acknowledged that he was not to be paid for his service. Fazzio then instructed Henry to report to the den in Algiers, and at this point he was met by the two motorcycle officers assigned to accompany the float to City Hall.
*402 The police and the driver did not confer on procedure before leaving the den, but the motorcycle officers testified they used a standard “leapfrog” pattern in conducting this escort. Under this procedure one officer would ride ahead and clear traffic for one full block, after which the other officer would conduct the float through the cleared area. In each succeeding block the actions of the officers would be alternated.
On the morning of the accident, Henry backed the float from the den, and in the company of the officers it proceeded uneventfully for three blocks. Both motorcycle officers were stopped at the intersection of Tjeche and Newton Streets, and when the float was approximately 20 feet behind them, Officer Robert F. Miller, Jr., started forward to clear traffic in the next block. Henry did not notice the plaintiff still stopped before him and continued driving the float until it rammed plaintiff in the back as he sat on his motorcycle. Apparently plaintiff was pinned to his vehicle by a piece of the plywood float resting on his back.
After the police conducted an investigation of the accident, former Superintendent Giarrusso instructed that Henry be permitted to continue driving the float, despite the fact that it had been learned at the scene he had an expired drivers license. Thus Henry drove the float to City Hall and then in the parade procession without further mishap. Kern explained that no special skill to drive a float is required other than knowing how to operate a regular motor vehicle.
The driver’s liability is not at issue since he • took no appeal from the judgment against him, based on the finding he failed to see what he should have seen and that this negligence was the proximate cause of the accident.
As to the liability of the designer and its insurer, plaintiff urges they should be cast in judgment under either one of two theories, namely, (1) the float was constructed in such a manner that it did not afford to the driver a clear and unobstructed view of traffic conditions or (2) the public liability policy issued by Phoenix to Kern provided coverage for permissive users of the float. Our review of the record fails to disclose any factual bases upon which either theory of liability may be imposed.
The only explicit testimony in the record quoad visibility indicates the driver had a clear and unobstructed view of conditions in the front, to the sides and to the rear of the float for 360 degrees save and except for two-by-four braces on each of the four corners. Even Henry’s testimony indicates the accident was not the result of restricted visibility because, according to him, he should have been able to see a stopped motorcycle 20 feet in front of him.
On the question of insurance coverage under permissive use, the testimony of Blaine Kern stands uncontradicted that he donated the float and abdicated any responsibility therefor after it left the den. That he specifically instructed the Society to provide insurance is indicated by the fact that it did obtain its own insurance and that Kern’s testimony was not contradicted by any member of the Society with whom he had made arrangements.
A review of the contract of insurance reflects that the tractor or “mule” [2] used to propel the float was not one of the vehicles listed in, or a newly acquired “automobile” within the contemplation of, the Comprehensive General-Automobile Liability Policy issued by Phoenix of Hartford to Blaine Kern Artists, Inc. Since the permissive use clause is only applicable to vehicles described in or contemplated by the general coverage section, it cannot be in *403 voked because the tractor does not fall into either of these categories.
While there is a specific endorsement pertaining to parade floats-trailers, the coverage thereunder is limited to floats-trailers “rented to others” and propelled by automotive vehicles “not owned or hired by the insured.” In the instant matter, the float was not rented but gratuitously donated to the Society and the tractor was owned by the insured. Therefore, no coverage is afforded under this endorsement.
Accordingly we conclude the trial court properly found neither Kern nor Phoenix liable.
 Plaintiff next contends the trial court erred in dismissing the Society and Continental, its insurer. In this connection we note both of these defendants have filed a plea of prescription. In the original petition, filed August 10, 1967, plaintiff sued Kern, Phoenix and Henry, alleging the latter was an employee of Kern. It was not until January 4, 1972, almost five years after the accident, that plaintiff through new counsel filed a supplemental and amended petition joining the Society and Continental as additional parties defendant.[3] The Society and its insurer could only be held liable in the event it was found one of its members was guilty of negligence while acting for the Society; or Henry was, in legal contemplation, an “employee” of the Society when the accident occurred. Absent a finding the Society was independently negligent and thus a joint tort-feasor with Henry, the filing of a suit against Henry alone did not serve to interrupt prescription running in favor of his alleged employer. In Little v. State Farm Mutual Automobile Ins. Co., 177 So.2d 784 (La.App. 1st Cir. 1965), the court held a suit against an employee does not interrupt prescription with respect to the non-negligent employer because there is no solidary liability between master and servant. The basis for the plea of interruption is LSA-C.C. art. 3552, which provides, inter alia, a suit filed against one debtor in solido interrupts prescription with respect to any other. Even if we assume arguendo that Henry was the employee of the Society, this relationship of itself would not produce the legal consequence of solidary liability, the prerequisite element necessary to interrupt prescription.
Plaintiff has failed to sustain by a preponderance of evidence the specific allegations of negligence against the Society which would render it a joint tort-feasor with the driver. On the contrary, they are clearly refuted. As pointed out by Kern, no specific training is required to drive a float except to operate the standard automotive shift on the tractor. The fact that Henry did drive the float in the procession without further incident attested to his competency and confirmed that no special knowledge is required.
The only attack leveled against the safety of the float itself is the lack of proper visibility for its operator. Again the only evidence bearing on this issue reflects that the driver had a 360-degree range of visibility through a 32-inch opening which is better than that afforded by the average automobile or truck. (As we have previously noted, the visibility afforded the driver was more than ample to insure the safe movement of the float.) This testimony remains uncontradicted.
Accordingly we conclude the Society was not a joint tort-feasor and that under the Little case and LSA-C.C. art. 3552 a filing of the suit against Henry did not interrupt prescription against the Society. The plea of prescription filed on behalf of the Society and Continental is maintained.
*404 Finally we turn to the question of quantum. Plaintiff contends an award of $10,779 is inadequate. We note the medical testimony establishes that the plaintiff suffered a fracture of the transverse process of the second lumbar vertebra (a small bone off the main part of the .vertebral body). As a result he could not work for approximately two months, after which time he returned to light duty. On June 23, 1967, Dr. Hyman Soboloff, the treating orthopedist, advised plaintiff he could try to return to motorcycle duty, which he did. He returned to Dr. Soboloff on several later occasions, complaining of persistent pain in his back.
On November 5, 1969, plaintiff took a disability retirement from the police department and attempted to attribute his action to the injury incurred in this accident. It developed during the trial that plaintiff had been involved in two accidents between the float incident and the date of retirement — one on June 27, 1968, and the other on' August 8, 1968. Both involved back injuries for which he sought treatment from different doctors other than Dr. Soboloff, from whom he withheld the information. His expert witness, Dr. Sobo-loff, upon learning of the later injuries, said he could not testify the March 18, 1967 accident caused the disability that prompted plaintiff to seek retirement but it was one of the factors. His claim for damages included loss of future income occasioned by his early retirement.
We think the medical evidence establishes plaintiff injured his back in the motorcycle-float accident, was disabled for two months, and experienced pain for an additional six to eight months. Based on this finding, we think an award of $10,000 for the injury, pain and suffering is adequate in addition to the special damages of $779 allowed by the trial court.
Plaintiff has requested us to amend the judgment of the trial court to include an award of expert fees to the medical witnesses. We think this is proper.
For the reasons assigned, the judgment appealed from is amended to award $100 each as expert fees to Dr. Jack Castrogiov-anni, to Dr. Stuart Phillips, to Dr. William Leon, to Dr. Carl Rabin and to Dr. Hyman ■Soboloff, and in all other respects, the judgment is affirm,ed. Costs of this appeal are to be borne by the appellant.
Amended and affirmed.

. The judgment of the lower court also dismissed multiple third party claims filed by the defendants. None of the third party ae-tions are before us in view of the fact that no third party plaintiff has appealed.

. The “mule” propelling this float is described as A-14D Shopmulle, Serial No. 5768, Engine No. UEHM7492.

. The supplemental petition alleges that the Society and Continental are liable in solido with the original defendant; that Henry was an employee of the Society; and, alternatively, that the Society was negligent in allowing an inexperienced operator to drive the float and for permitting an unsafe float lacking in proper visibility to be driven on the streets.